THIS OPINION IS A
PRECEDENT OF THE TTAB

Mailed:
March 31, 2014

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

Trademark Trial and Appeal Board
_____

*Hunter Industries, Inc.*
*v.*
*The Toro Company*
_____

Opposition No. 91203612
to application Serial No. 85067325
_____

Michael H. Jester, Esq., for Hunter Industries, Inc.

Linda M. Byrne, Esq., of Crawford Maunu PLLC for The Toro Company.
_____

Before Kuhlke, Mermelstein and Greenbaum, Administrative Trademark Judges.

Opinion by Greenbaum, Administrative Trademark Judge:

The Toro Company ("applicant") seeks registration on the Principal Register of the standard character mark PRECISION for goods ultimately identified as "irrigation equipment and components, namely, spray nozzles, rotating nozzles and soil moisture sensors for irrigating landscapes, lawns and gardens."[1]

---

[1] Application Serial No. 85067325, filed June 21, 2010, alleging December 2009 as the date of first use anywhere and in commerce. Pursuant to the parties' Accelerated Case Resolution ("ACR") Agreement (TTABVue 7), mentioned below, the Board approved a consented amendment to the identification of goods (TTABVue 10) which resulted in the

In the first amended notice of opposition, Hunter Industries, Inc. ("opposer") alleges that it has made prior use analogous to trademark use of PRECISION DISTRIBUTION CONTROL, as well as prior common-law use of PRECISION DISTRIBUTION CONTROL as a trademark, on irrigation sprinklers, and that as a result of the similarity between the parties' marks as used in connection with their respective goods, confusion is likely among consumers as to the source of those goods under Section 2(d) of the Lanham Act, 15 U.S.C. § 1052(d).

In its answer, applicant denied the salient allegations in the first amended notice of opposition, and further alleged that "[o]pposer has not used continuously, and/or is not currently using, the PRECISION DISTRIBUTION CONTROL term as a trademark in connection with irrigation sprinklers as alleged in the Amended Notice of Opposition" (Answer, at Affirmative Defense No. 2, TTABVue 6), and opposer lacks priority.[2] *Id.*, at Affirmative Defense No. 3.

Both parties submitted briefs, and opposer submitted a reply brief.

*Accelerated Case Resolution*

The parties entered into an agreement to proceed via Accelerated Case Resolution ("ACR Agreement") (TTABVue 7), and are commended for doing so. The agreement provided for limits on discovery that could be taken, specified various methods by which documents and things would be produced, excluded from this

---

above identification, and noted, but did not approve, a consented amendment to applicant's dates of use (TTABVue 132), by which applicant asserts November 2008 and February 2009 as the date of first use and first use in commerce, respectively.

[2] Applicant asserted the affirmative defense of estoppel in its answer, but did not argue it in its brief, thus waiving the defense. Answer, at Affirmative Defense No. 1, TTABVue 6.

proceeding the filing of motions for summary judgment and the use of expert testimony, and streamlined the methods for introduction of evidence during trial by, among other things, permitting testimony to be filed in the form of affidavits or declarations. As the sole stipulation of fact, the parties agreed that they are "unaware of any actual confusion between the PRECISION mark and the term 'Precision Distribution Control.'" ACR Agreement, ¶ 17, TTABVue 7. The Board approved the ACR Agreement on June 26, 2012 (TTABVue 8).[3]

*Motion to Strike*

Before we make our final determination on the merits, we must address opposer's motion to strike certain testimony and exhibits (TTABVue 111), consideration of which the Board deferred on April 12, 2013 until final hearing (TTABVue 132).

Applicant's testimony period closed on February 15, 2013. On February 14, 2013, applicant filed, through ESTTA, testimonial declarations of three employees (TTABVue 110) and redacted and unredacted versions of the testimonial declarations of six non-party distributors (TTABVue 110 and 125). On that same day, applicant also mailed to the Board a flash drive containing approximately 170 exhibits (Exhibits A-FC and FF-FQ, TTABVue 126), and a CD-ROM containing two videos from YouTube (Exhibits FD and FE, TTABVue 126). On February 15, 2013, applicant filed both redacted and unredacted versions of the testimonial declaration

---

[3] The Board generally issues decisions on ACR cases within fifty days of the date the case is determined to be ready for decision. *See* TBMP § 528.05(a)(2) (3d ed. rev.2 2013). However, as this decision is a precedent of the Board, it required additional pre-issuance internal review. The number and nature of the parties' objections also contributed to the delay in issuing the decision.

of an additional non-party distributor (TTABVue 127). Opposer has moved to strike applicant's trial exhibits A-FQ, the related testimony and all references in applicant's brief to the exhibits or testimony, because applicant submitted the evidence in a form not specified in Trademark Rule 2.126, 37 C.F.R. § 2.126. Alternatively, opposer has moved to strike the foregoing materials and testimony, asserting that applicant is estopped from submitting it under Fed. R. Civ. P. 37(c)(1) because applicant did not timely identify and produce said exhibits in response to opposer's discovery requests.[4] Opposer also seeks to strike the declarations of the seven distributors because applicant improperly redacted their names, employers, locations, and their signatures, allegedly in violation of the terms of the Standard Protective Order, as modified by the ACR Agreement.

*Exhibits Submitted to the Board on Flash Drive and Compact Disc*

Applicant contends that it submitted the exhibits on a flash drive and CD-ROM because they were too large for email, and that submission of the exhibits in this manner comports with paragraphs 4 and 8 of the ACR Agreement, which state, respectively, "[t]he parties consent to service via mail, courier and email…" and "[n]either party will object as to the authenticity or admissibility of … declarations, documents, [and] exhibits … so long as the declarant establishes that … the evidence was otherwise submitted to the Board in a manner permitted by the rules or this Stipulation." However, neither paragraph pertains to the form in which

---

[4] Paragraph 16 of the ACR Agreement precludes objections to evidence on the basis that the evidence was not included within either initial or pretrial disclosures. However, the ACR Agreement does not include a provision precluding objection on the basis that evidence introduced at trial should have been revealed when responding to discovery requests as set forth in Fed. R. Civ. P. 37(c)(1).

documents can be *filed* with the Board (as opposed to *served* on an adversary) and, in any event, while the Board allows parties to stipulate to the manner that evidence is introduced into the record, that evidence must conform to the "form of submission" requirements set forth in Trademark Rule 2.126. These requirements are needed to facilitate the Board's receipt, handling and storage of evidence, and may not be overridden by agreement of the parties. Moreover, Trademark Rule 2.126 does not allow for submission of materials on flash drive or compact disk.[5] Further, the ACR Agreement does not state that documents referenced in testimonial declarations filed through ESTTA did not also need to be filed through ESTTA, and in approving the ACR Agreement, the Board did not agree to suspend any provisions of Trademark Rule 2.126. Also unavailing is applicant's argument that it filed the exhibits via flash drive because they were too large for email, as the Board does not accept documents for filing by email. *See* TBMP § 106.03.[6]

We grant opposer's motion to strike Exhibits A-FC and FF-FQ because applicant did not file the exhibits on paper or by electronic means via ESTTA as

---

[5] At one time, Trademark Rule 2.126(b) specifically provided that evidence could be made of record by CD-ROM. The method was infrequently used and proved to be burdensome to the Board. By amendment effective August 31, 2007, and applicable to all cases pending or commenced on or after that date, Trademark Rule 2.126(b) no longer accords parties the option of making submissions to the Board in CD-ROM form. *See e.g., Swiss Watch International Inc. v. Federation of the Swiss Watch Industry*, 101 USPQ2d 1731, 1734 n.5 (TTAB 2012) (petitioner submitted CD-ROM versions of the testimony depositions, as well as the printed versions, and was advised that it was not necessary to submit the CD-ROMs and that the rules no longer provided that testimony can be submitted in this manner). However, when recorded sound and video files cannot be printed and submitted as exhibits through ESTTA or regular mail, the Board has long accepted, and continues to accept, such exhibits on CD-ROM or DVD.

[6] To the extent applicant's reference to "email" was intended as a reference to the difficulty of submitting large data files by ESTTA, we note that applicant could have divided the large data files into smaller files, as opposer did, to facilitate filing via ESTTA. *See* TBMP § 110.09(c).

Trademark Rule 2.126 requires. However, because applicant properly submitted the testimony of the three witnesses via declaration as per the parties' ACR Agreement, we do not strike the declarations or the references to the testimony in applicant's brief. Instead, we will accord the testimony whatever probative value it merits, keeping in mind that the testimony may be unsupported to the extent that it refers to or relies on stricken exhibits.

We now turn to Exhibits FD and FE, which applicant identified on February 4, 2013, and produced on February 14, 2013, as part of its third supplemental response to opposer's document requests (TTABVue 118). In this response, applicant identifies Exhibit FD as a "YouTube Video titled 'Smart Irrigation Systems featuring Toro Precision™ Irrigation Products' describing water savings achieved by installing Toro's PRECISION spray and rotating nozzles," and Exhibit FE as a "YouTube Video titled 'Toro on World's Greatest! TV Series' describing Toro's PRECISION irrigation products." Exhibits consisting of video or audio recordings of commercials, demonstrations, etc., may be transferred to an appropriate electronic format for submission to the Board.[7] *See generally* TBMP § 106.03. Accordingly, we do not strike Exhibits FD and FE based on the form of their submission. Instead, as discussed below, we grant opposer's motion to strike Exhibits FD and FE because applicant did not disclose them in a timely fashion.

---

[7] ESTTA, the Board's electronic filing system, is currently unable to accept audio or video files. Therefore, as noted above, when a party needs to submit such materials, the party currently must record the materials on an appropriate medium, such as a CD-ROM or DVD, and physically file that medium with the Board.

A party that fails to provide information may, upon motion or objection by its adversary, be precluded from using that information or witness at trial, "unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). *See e.g., Panda Travel, Inc. v. Resort Option Enterprises, Inc.*, 94 USPQ2d 1789, 1792-93 (TTAB 2009) (documents not produced until after the start of trial stricken). *See also* TBMP § 527.01(e) and cases cited therein. Parties have a duty to supplement discovery responses "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1)(A).

Applicant does not dispute that exhibits FD and FE were responsive to at least one of the requests contained in opposer's first request for documents, served on July 2, 2012, or that applicant first produced the materials more than seven months thereafter, during applicant's testimony period. Applicant provided no reason for its failure to produce these materials earlier, stating only that it provided the documents upon discovering them. However, in responding to a request for document production, a party has a duty to search its records and to provide responsive documents to the requesting party within the time allowed for response. Although the untimely production of requested documents may be excused if the delay was substantially justified or harmless, applicant did not provide a reason why these videos were not "discovered" and produced in a timely manner.

Applicant's production of Exhibits FD and FE during applicant's testimony period was manifestly untimely. Opposer's objection to the exhibits on that basis is sustained. *See e.g., Panda Travel*, 94 USPQ2d at 1792-93.

In sum, we sustain opposer's objections to applicant's trial exhibits A-FQ. In view thereof, we have not considered those exhibits.[8]

*Distributor Declarations*

In an attempt to rebut opposer's claim of priority and likelihood of confusion, applicant proffered the declarations of seven distributors who work for companies that carry irrigation equipment manufactured by applicant and third parties (TTABVue 110 and 127). Five of the distributors also carry irrigation equipment manufactured by opposer. *Id.* Applicant designated portions of these declarations as "Trade Secret/Business Confidential" pursuant to the Board's Standard Protective Order as modified by the parties' ACR Agreement.[9] Accordingly, the declarations were filed as confidential with the Board, along with redacted versions for the publicly-available file. Unredacted copies also were filed with the Board and served on opposer's counsel; however, counsel was prohibited from divulging them to

---

[8] We add that consideration of the stricken exhibits would not have altered our determination on the merits.

[9] Paragraph 1 of the ACR Agreement provides, in pertinent part: "the parties further stipulate that certain proprietary documents may be redacted by the disclosing party to delete confidential information. Any such redaction will be as minimal as possible, while still maintaining the confidential status of business sensitive information. The confidential status of even redacted documents will be protected according to the terms of the Protective Order." TTABVue 7. The Standard Protective Order covers three classes of protected information by allowing parties to designate appropriate information as "confidential," "highly confidential," or "trade secret/commercially sensitive." We do not interpret paragraph 1 or any other paragraph of the ACR Agreement as creating a fourth class, i.e., "trade secret/**business confidential**." Instead, we construe "business confidential" to mean "commercially sensitive."

opposer itself. Information redacted from the declarations includes the name, employer, location and signature of each declarant.

In the motion to strike, opposer asserts that applicant has over-designated as confidential the identifying information of the declarants, thereby restricting access to this information by opposer's in-house personnel. Opposer had informed applicant of its intention to raise this challenge per paragraph 14 of the Board's standard protective order on January 3, 2013, the day after applicant served its confidential and non-confidential pretrial disclosures, and invited applicant to participate in a telephone conference with the interlocutory attorney to resolve the matter.[10] TTABVue 121. On January 11, 2013, opposer reiterated its concerns and its continuing availability to negotiate the issue with the assistance of the interlocutory attorney.[11] TTABVue 123. Applicant did not respond to this invitation, and chose instead to submit the seven declarations with the identifying information redacted. In so doing, applicant took a calculated risk, and cannot now claim prejudice if the Board grants the motion to strike and excludes the declarations.

Based on our review of the unredacted declarations, we agree with opposer that the identifying information should not have been designated "trade

---

[10] In the motion to strike (TTABVue 111), opposer states that when it received applicant's pretrial disclosures, opposer "interpreted those documents as indicating that [applicant] intended to designate the identities of nine (9) third party witnesses, the substance of their testimony and the documents that they would refer to as 'Trade Secret/Business Confidential.'" In its January 10, 2013 response to opposer's January 3, 2013 letter, applicant narrowed the confidentiality designation to its present form. TTABVue 122. The January 3, January 10 and January 11 letters are attached as Exhibits 82-84 to the Jester Declaration in Support of Plaintiff's Motion to Strike.

[11] The Board does not entertain motions in limine. Thus, opposer was unable to raise the matter by motion until applicant submitted the declarations during its testimony period.

secret/commercially sensitive." We understand applicant's reluctance to divulge the declarants' names and other identifying information to its competitor, especially when both parties acknowledge that they share many of the same distributors. However, while a party generally is not required to share its customer list with its adversary, when a party relies on testimonial evidence *at trial*, its adversary must have a meaningful opportunity to confront the witness and inquire into his or her credibility and the facts to which he or she testifies. *Cf., Fisons Ltd. v. Capability Brown Ltd.*, 209 USPQ 167, 169 (TTAB 1980) (need for names of customers, as in case where issue is abandonment, outweighs justification for protecting customer confidentiality). Nothing in the parties' ACR Agreement abrogates that fundamental right.[12]

A party's right to confront an adverse witness is significantly impaired when it is prevented from knowing the name, employer and location of the witness. Although opposer's counsel was privy to the redacted information, opposer itself practices in the relevant industry and likely is familiar with some or all of the witnesses or their employers. That kind of information may be critical when considering adverse testimony, and it generally should not be kept from a party. While this information may be protectable during discovery, it is no longer subject

---

[12] The Board is sensitive to claims that disclosure of certain information to an adverse party or to the public would damage a party's legitimate interests, and routinely permits the designation and filing of such material as confidential. Nonetheless, except in unusual circumstances, Board proceedings are open to the public; the mere assertion that information is confidential does not make such designation proper. "What happens in the halls of government is presumptively public business. ... Any step that withdraws an element of the judicial process from public view makes the ensuing decision look more like fiat, which requires compelling justification." *Union Oil Co. of Cal. v. Leavell*, 220 F.3d 562, 568 (7th Cir. 2002).

to such protection when the individual is named as a witness. If the witness does not want to be identified, the witness should not provide trial testimony. In essence, when a party chooses to rely on the testimony of a witness at trial, the party has waived the protection provided to trade secret/commercially sensitive information, and can no longer shield the identity of the witness. *Cf., Super Valu Stores Inc. v. Exxon Corp.*, 11 USPQ2d 1539, 1543 (TTAB 1989) (a party may not assert attorney-client and work product privilege in discovery and then waive the privilege to use the information at trial.).

Applicant has not pointed to any precedent, nor are we aware of any, that would permit applicant to shield a witness' identifying information in a Board proceeding. Under the terms of the Standard Protective Order, as modified by the parties' ACR Agreement, opposer's counsel should have been able to share with opposer the names of the witnesses testifying against opposer. Our consideration of the seven declarations under these circumstances would be unfairly prejudicial to opposer. Accordingly, opposer's motion to strike is granted.

*Record*

The record includes the pleadings (TTABVue 1, 4 and 6) and, by operation of Trademark Rule 2.122(b), 37 C.F.R. § 2.122(b), applicant's application file.

In view of the evidentiary rulings above, the record also consists of the following testimony and evidence from each party.

Opposer submitted the declarations of opposer's Vice President of Marketing, Phillip E. Smith (TTABVue 13), with associated exhibits (Opposer's Exhibits 61-64,

TTABVue 92-95) and opposer's Product Manager, Richard M. Dunn (TTABVue 14), with associated exhibits (Opposer's Exhibits 1-60, TTABVue 15-91). Opposer also submitted under Notice of Reliance (TTABVue 96) official USPTO records (Opposer's Exhibits 65-67B, TTABVue 97-100), and applicant's answers to opposer's interrogatories, requests for admissions and document requests[13] (Opposer's Exhibits 68-70, TTABVue 101-103). In addition, opposer submitted the supplemental declaration of Richard M. Dunn (TTABVue 104) with associated confidential exhibits, filed under seal (Opposer's Exhibits 71-73, TTABVue 105-107).

Applicant submitted a Notice of Reliance on excerpts from opposer's responses to applicant's first and second sets of requests for admission, first and second sets of interrogatories and first set of document requests, and dictionary definitions of the words "distribution" and "control" (TTABVue 109). Applicant submitted the testimony declarations (TTABVue 110) of Peter Moeller, applicant's

---

[13] Responses to document requests generally cannot be made of record by notice of reliance. *See* Trademark Rule 2.120(j)(3)(ii) (responses to document requests not generally admissible under notice of reliance unless otherwise admissible under Trademark Rule 2.122(e)); *Life Zone Inc. v. Middleman Group Inc.,* 87 USPQ2d 1953, 1955 (TTAB 2008) (listing limited categories of materials which may be submitted under notice of reliance). Although not applicable here, an exception exists when the written responses are objections or statements that no such documents exist. *See Calypso Tech. Inc. v. Calypso Capital Mgmt. LP,* 100 USPQ2d 1213, 1217 n.8 (TTAB 2011). Paragraph 8 of the ACR Agreement stipulates to the manner in which the parties may submit evidence, and waives objections "as to the authenticity or admissibility of the affidavits, declarations, documents, exhibits and discovery deposition testimony so long as the declarant or affiant establishes that he or she has knowledge of the facts presented or so long as the evidence was otherwise submitted to the Board in a manner permitted by the applicable rules or this Stipulation." TTABVue 7. The ACR Agreement does not include a stipulation that the parties may submit responses to document requests by notice of reliance. However, since both parties introduced responses to document requests by notice alone, and neither party objected, we treat the responses as being stipulated into the record.

Director of Marketing, Irrigation Division, Michael Baron, applicant's National Specifications & Sales Manager for Water Management Products, and R. Lawrence Buckley, applicant's in-house intellectual property attorney.

During its rebuttal period, opposer submitted a Supplemental Notice of Reliance (TTABVue 133) on registration certificates and corresponding official USPTO file histories for the PRECISION INDUCTION COOKTOP registration owned by third-party Hearthware (Opposer's Exhibits 85-87c, TTABVue 134-138), and the TRUE PRECISION CONTROL registration owned by third-party True Manufacturing Company (Opposer's Exhibits 88-90c, TTABVue 139-143); an excerpt from opposer's 2013 electronic product catalog (Opposer's Exhibit 92, TTABVue 145); an excerpt from a MonsterMarketplace.com 2013 electronic catalog (Opposer's Exhibit 93, TTABVue 146); and a January 2005 Golf Course management blog (Opposer's Exhibit 94, TTABVue 147).[14] Opposer also submitted

---

[14] Opposer also submitted a November 2012 product brochure for opposer's I-60 rotor (Opposer's Exhibit 91, TTABVue 144). The product brochure is not a printed publication or official record that is admissible under notice of reliance alone (*see* Trademark Rule 2.122(e)), and the ACR Agreement does not include a stipulation that the parties may submit this type of evidence in this manner. Applicant did not object to the admissibility of the brochure, but neither did it address the brochure on the merits in its brief. We do not think that this conduct rises to the level of a waiver of the admissibility issue. We therefore do not deem the brochure to be of record. *Cf. Hilson Research Inc. v. Society for Human Resource Mgmt.*, 27 USPQ2d 1423, 1426 n.8 (TTAB 1993) (where material was inadmissible, but the opposing party raised no objection and mentioned the material in its briefs as though properly of record, the Board treated any objection as waived). The electronic catalogs and blog meet the admissibility requirements set forth in *Safer, Inc. v. OMS Investments, Inc.*, 94 USPQ2d 1031 (TTAB 2010). However, applicant objected to the weight to be accorded Exhibits 91-93 (and others) because they post-date applicant's purported 2008 priority date. As evidence of later use can be relevant to showing opposer's continued use of its mark, the objection is overruled. Other than Exhibit 91, which is not of record, we will accord the exhibits appropriate probative value.

13

the Declaration of Megan M. Lally, Marketing Director of Boston Irrigation Supply Company, Inc. ("BISCO"), a distributor of opposer's sprinklers (TTABVue 148).

*The Parties*

Opposer's witness, Mr. Smith, testified that opposer manufactures products for irrigating golf courses, landscapes, lawns and gardens, as well as landscape lighting products. Smith Decl., ¶17, TTABVue 13. According to Mr. Smith, opposer's products include sprinklers, valves, and electronic irrigation controllers, among other things. *Id.* ¶ 18. Also according to Mr. Smith, opposer and applicant are well-established competitors in the marketplace for irrigation products (*id.* ¶ 19), and are two of the three largest manufacturers of residential and commercial irrigation products in the world. *Id.* ¶ 20.

Applicant's witness, Mr. Moeller, testified that applicant "sells a wide variety of irrigation equipment and components under the PRECISION trademark, including spray nozzles, rotating nozzles and soil moisture sensors for irrigating turf, landscapes, lawns and gardens." Moeller Decl., ¶ 4, TTABVue 110.

*Standing*

Standing is a threshold issue that must be proven in every inter partes case. *See Lipton Industries, Inc. v. Ralston Purina Co.*, 670 F.2d 1024, 213 USPQ 185, 189 (CCPA 1982). To establish standing in an opposition, an opposer must show that it has a "real interest" in the outcome of the proceeding; that is, that it has a direct and personal stake in the outcome of the opposition. *See Ritchie v. Simpson*, 170 F.3d 1092, 50 USPQ2d 1023 (Fed. Cir. 1999). The record shows that opposer and

applicant are competitors in the irrigation products market. As discussed below, opposer has demonstrated its use of the mark PRECISION DISTRIBUTION CONTROL. Therefore, opposer has established its standing to bring this proceeding.

*Priority*

"To establish priority, [opposer] must show proprietary rights in the mark that produce a likelihood of confusion…. These proprietary rights may arise from a prior registration, prior trademark or service mark use, prior use as a trade name, prior use analogous to trademark or service mark use, or any other use sufficient to establish proprietary rights." *Herbko Int'l., Inc. v. Kappa Books, Inc.*, 308 F.3d 1156, 64 USPQ2d 1375, 1378 (Fed. Cir. 2002) (internal citations omitted); *Otto Roth & Co. v. Universal Foods Corp.*, 640 F.2d 1317, 209 USPQ 40, 43 (CCPA 1981). Inasmuch as applicant has not established use of its mark in connection with its goods prior to the filing date of its application, the earliest date upon which applicant may rely for priority purposes is June 21, 2010, which is its constructive use date. *Syngenta Crop Prot. Inc. v. Bio-Chek LLC*, 90 USPQ2d 1112, 1119 (TTAB 2009) ("applicant may rely without further proof upon the filing date of its application as a 'constructive use' date for purposes of priority."). We therefore must determine whether opposer has established proprietary rights in its mark PRECISION DISTRIBUTION CONTROL prior to June 21, 2010. Because opposer has not pleaded any registrations, opposer must rely on its common-law use to establish priority.

Our evaluation of opposer's proprietary rights begins with the distinctiveness of opposer's mark. Applicant argues that its mark PRECISION is suggestive, but

15

implies that opposer's mark is merely descriptive, and thus opposer must achieve proprietary rights in its mark by showing acquired distinctiveness.[15] We do not believe that the record sufficiently supports a finding that opposer's mark, in its entirety, is merely descriptive of opposer's goods. Moreover, even if opposer's mark is merely descriptive, we find that opposer has presented ample documentary and testimonial evidence to establish that it acquired distinctiveness in PRECISION DISTRIBUTION CONTROL prior to June 21, 2010. *Hydro-Dynamics Inc. v. George Putnam & Company Inc.,* 811 F.2d 1470, 1 USPQ2d 1772 (Fed. Cir. 1987) (in a case involving common-law rights, the Board must make its decision as to priority "in accordance with the preponderance of the evidence."); *See Perma Ceram Enterprises Inc. v. Preco Indus. Ltd.,* 23 USPQ2d 1134, 1136 (TTAB 1992) ("[w]here the mark relied upon by a plaintiff in support of its priority of use and likelihood of confusion claim is merely descriptive…, then the plaintiff must establish priority of acquired distinctiveness."). Various types of evidence can be considered to determine if a mark has acquired distinctiveness. *In re Steelbuilding.com,* 415 F.3d 1293, 75 USPQ2d 1420, 1424 (Fed. Cir. 2005) ("In determining whether secondary meaning has been acquired, the Board may examine copying, advertising expenditures, sales success, length and exclusivity of use, unsolicited media coverage, and consumer studies (linking the name to a source)."). (citation omitted).

Opposer submitted as exhibits to the Dunn Supplemental Declaration (TTABVue 104) three confidential documents: total advertising and marketing

---

[15] This is somewhat puzzling, as the word PRECISION, if descriptive when combined with the terms DISTRIBUTION CONTROL and used on opposer's goods, would appear to be equally descriptive when used, alone, on applicant's goods.

16

expenditures since opposer began to sell PRECISION DISTRIBUTION CONTROL sprinklers (Opposer's Exhibit 71, TTABVue 105); annual sales figures for various sprinklers from 1992-2003, all sold under the PRECISION DISTRIBUTION CONTROL mark (Opposer's Exhibit 72, TTABVue 106)[16]; and annual sales figures for the I-60 sprinkler model from 2000-2011 sold under the PRECISION DISTRIBUTION CONTROL mark (Opposer's Exhibit 73, TTABVue 107). The sales figures and marketing expenditures are appreciable. According to opposer's witnesses, Messrs. Smith and Dunn, opposer continuously has sold irrigation sprinklers under the PRECISION DISTRIBUTION CONTROL mark in the United States since 1992 (Smith Decl., ¶ 31, TTABVue 13; Dunn Decl., ¶ 24, TTABVue 14; Supp. Dunn Decl., ¶¶ 132 and 137), and such sprinklers include rotating nozzles for irrigating lawns. Dunn Decl., ¶ 26.

In addition, Messrs. Smith and Dunn testified that since 1992, opposer has included written nozzle installation instructions bearing the PRECISION DISTRIBUTION CONTROL mark in the boxes in which opposer's irrigation sprinklers have been shipped to customers throughout the United States. Smith Decl., ¶ 13, TTABVue 13, Dunn Decl., ¶ 36, TTABVue 14. Opposer submitted as exhibits to the Dunn Declaration reproductions of such written instructions dated

---

[16] This exhibit includes annual data from 1988, but the testimony from Messrs. Smith and Dunn is clear that opposer first began to use the PRECISION DISTRIBUTION CONTROL mark on the sprinkler models listed in this exhibit in 1992.

17

March 1996, March 1997, and April 2012. Opposer's Exhibits 17-19, TTABVue 38-40.[17]

Mr. Dunn also testified that opposer has had a booth at the annual Irrigation Association trade show and the annual Golf Industry Show since 1992, where it directly markets its irrigation sprinklers, including the PRECISION DISTRIBUTION CONTROL sprinkler. Dunn Decl., ¶ 59. The Irrigation Association trade show is the largest trade show for irrigation products in the United States, and thousands of landscape contractors and other customers for irrigation sprinklers attend the show every year. *Id.*, ¶ 58. Likewise, the Golf Industry Show is the largest trade show for golf irrigation products in the United States, and thousands of golf course superintendents, golf course designers and irrigation contractors representing customers for irrigation sprinklers attend the show every year. *Id.*

Opposer submitted as exhibits to the Dunn Declaration fourteen photographs of opposer's booths at the 2000, 2001, 2003 and 2004 Golf Industry Shows showing posters, brochures, and table top placards displaying the PRECISION DISTRIBUTION CONTROL mark near samples of opposer's sprinklers. Dunn Decl., ¶¶ 60-63, TTABVue 14, Opposer's Exhibits 31-34, TTABVue 62-65. Mr. Dunn

---

[17] However, Mr. Dunn also testified that "from time to time, the nozzle installation instructions distributed by Plaintiff with its sprinkler having the PRECISION DISTRIBUTION CONTROL nozzle mechanism did not bear that trademark, but instead bore Plaintiff's PDC common law trademark." Dunn Decl., ¶ 38, TTABVue 14. Opposer submitted one such installation instruction sheet, dated October 1997, as an attachment to the Dunn Declaration. Opposer's Exhibit 20, TTABVue 41. We observe that the extent of the use of PDC instead of PRECISION DISTRIBUTION CONTROL on the installation instruction sheet is unclear from this record, but that it does not obviate the evidence showing continuous use of PRECISION DISTRIBUTION CONTROL on these inserts.

further testified that thousands of customers and prospective customers visited opposer's booth in each of those years, that hundreds of them took brochures in 2001, and that hundreds of them viewed the sprinklers and adjacent placards in 2003 and 2004. *Id*.

With regard to opposer's additional marketing efforts, Messrs. Smith and Dunn testified that since 1992, opposer continuously has distributed printed paper copies of product brochures advertising irrigation sprinklers under the PRECISION DISTRIBUTION CONTROL mark in the United States. Smith Decl., ¶ 32, TTABVue 13, Dunn Decl., ¶ 14, TTABVue 14. Opposer submitted twenty-two such product brochures as exhibits to the Dunn Declaration, spanning the years 1992 to 2011 (Opposer's Exhibits 2A-16, TTABVue 16-37).

Further, Messrs. Smith and Dunn testified that since 1994, opposer annually has distributed throughout the United States hard copies of its irrigation product catalogs advertising irrigation sprinklers under the PRECISION DISTRIBUTION CONTROL mark. Smith Decl., ¶ 40, Dunn Decl., ¶¶ 46-47. As exhibits to the Dunn Declaration, opposer submitted copies of the front and back covers and internal pages of opposer's catalogs, distributed from 1994 through 2009, advertising opposer's sprinklers featuring the PRECISION DISTRIBUTION CONTROL nozzle. Dunn Decl., ¶ 47, Opposer's Exhibits 21-29, TTABVue 42-50. The catalogs generally cover a two-year period. Smith Decl., ¶ 41, Dunn Decl., ¶ 48. Each catalog includes a picture of the sprinkler adjacent to a list of "features and benefits" that displays opposer's PRECISION DISTRIBUTION CONTROL mark preceded by the word

"Patented" or "Exclusive," and, with the exception of the 1994-1995 catalog, followed by the ™ symbol. Dunn Decl., ¶¶ 51-52. In addition, the rear cover of each catalog shows opposer's telephone number so that customers may obtain the nearest retail location of one of opposer's distributors of the PRECISION DISTRIBUTION CONTROL sprinkler. *Id.*, ¶ 53.

Opposer also submitted as exhibits to the Dunn Declaration excerpts from its electronic product catalogs spanning the years 2003-2004 and 2007-2012, each of which displays a picture of the sprinkler and opposer's PRECISION DISTRIBUTION CONTROL mark in a manner similar to the hard copies of the catalogs. *Id.*, ¶ 56, Opposer's Exhibits 30A-30K, TTABVue 51-61.

Mr. Dunn further testified that opposer created several computer-based presentations displaying the PRECISION DISTRIBUTION CONTROL mark for use by opposer's marketing personnel and distributors in promoting opposer's sprinklers. Dunn Decl., ¶¶ 64-65, 67. Opposer submitted as exhibits to the Dunn Declaration five such presentations from 2005 and 2008-2010, Opposer's Exhibits, 35, 36, 38-40, TTABVue 66, 67, 69-71.

Overall, Messrs. Smith and Dunn testified that since 1992, opposer has distributed more than 1.5 million hard copies of the aforementioned catalogs, product brochures, training manuals and nozzle instructions throughout the United States (Smith Decl., ¶ 52, TTABVue 13, Dunn Decl., ¶ 69, TTABVue 14), and that opposer distributed about 80% of these hard copies before December 2009. Smith Decl., ¶ 53, Dunn Decl., ¶ 70.

Based on the entire record, including the testimony and evidence discussed above, we find that opposer has established common-law rights to the mark PRECISION DISTRIBUTION CONTROL for irrigation sprinklers since at least 1992, and that to the extent it is not inherently distinctive, the mark acquired distinctiveness well prior to applicant's priority date of June 21, 2010.[18] We turn then to the likelihood of confusion analysis.

*Likelihood of Confusion*

Our likelihood of confusion determination under Section 2(d) is based on an analysis of all of the probative facts in evidence that are relevant to the factors set forth in *In re E.I. du Pont de Nemours & Co.,* 476 F.2d 1357, 177 USPQ 563 (CCPA 1973). *See also, In re Majestic Distilling Company, Inc.,* 315 F.3d 1311, 65 USPQ2d 1201 (Fed. Cir. 2003). Two key considerations are the similarities between the marks and the similarities between the goods. *See Federated Foods, Inc. v. Fort Howard Paper Co.,* 544 F.2d 1098, 192 USPQ 24, 29 (CCPA 1976).

*Comparison of the Marks*

We begin with a comparison of applicant's mark PRECISION and opposer's mark PRECISION DISTRIBUTION CONTROL in their entireties in terms of sound, appearance, meaning and commercial impression. *See Palm Bay Imports, Inc. v. Veuve Clicquot Ponsardin Fondee En 1772*, 396 F.3d 1369, 73 USPQ2d 1689 (Fed. Cir. 2005). "The proper test is not a side-by-side comparison of the marks, but

---

[18] We note that even if applicant had submitted admissible evidence to show a November 2008 first use of its PRECISION mark, as set forth in applicant's proposed amendment, opposer's first use of PRECISION DISTRIBUTION CONTROL as a trademark precedes that date. Thus, such evidence would not have affected our determination of opposer's priority.

instead 'whether the marks are sufficiently similar in terms of their commercial impression' such that persons who encounter the marks would be likely to assume a connection between the parties." *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 101 USPQ2d 1713, 1721 (Fed. Cir. 2012) (internal citation omitted). In addition, while marks must be compared in their entireties, it is well settled that one feature of a mark may have more significance than another, and there is nothing improper in giving greater weight to the more significant feature. *See In re National Data Corp.*, 753 F.2d 1056, 224 USPQ 749 (Fed. Cir. 1985).

In this case, PRECISION is the dominant and most significant feature of opposer's mark, not only because it appears first in opposer's mark (*see Palm Bay*, 73 USPQ2d at 1692), but also because it has stronger source-identifying significance than the other elements of the mark. "Distribution control" clearly describes a significant feature of opposer's sprinklers, namely, that the water is distributed in a controlled fashion. Descriptive matter typically is less significant or less dominant when comparing marks. *See Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 55 USPQ2d 1842, 1846 (Fed. Cir. 2000), *quoting National Data*, 224 USPQ at 752 (Fed. Cir. 1983) ("Regarding descriptive terms, this court has noted that the descriptive component of a mark may be given little weight in reaching a conclusion on the likelihood of confusion.").

The term PRECISION also constitutes the entirety of applicant's mark. Likelihood of confusion often has been found where the entirety of one mark is incorporated within another. *See, e.g., In re Mighty Leaf Tea,* 601 F.3d 1342, 94

22

USPQ2d 1257, 1260 (Fed. Cir. 2010) (applicant's mark ML is similar to registrant's mark ML MARK LEES); *Lilly Pulitzer, Inc. v. Lilli Ann Corp.*, 376 F.2d 324, 153 USPQ 406, 407 (CCPA 1967) (THE LILLY as a mark for women's dresses is likely to be confused with LILLI ANN for women's apparel including dresses); *In re United States Shoe Corp.*, 229 USPQ 707, 709 (TTAB 1985) (CAREER IMAGE for women's clothing stores and women's clothing likely to cause confusion with CREST CAREER IMAGES for uniforms including items of women's clothing). In *United States Shoe,* the Board observed that "Applicant's mark would appear to prospective purchasers to be a shortened form of registrant's mark." 229 USPQ at 709. Likewise, in this case, applicant's mark PRECISION would appear to prospective purchasers to be a shortened form of opposer's mark PRECISION DISTRIBUTION CONTROL.

Because of the overall similarities of the marks, consumers are likely to view applicant's PRECISION mark as a variation or shortened version of opposer's PRECISION DISTRIBUTION CONTROL, with both marks indicating a single source for the goods. To the extent PRECISION is suggestive of a uniform and accurate spray pattern, as applicant contends with regard to its sprinklers, this term also has the same meaning for opposer's sprinklers. Therefore, we find that the parties' marks are substantially similar in sound, appearance, connotation and commercial impression.

23

*Comparison of the Goods, Channels of Trade and Classes of Purchasers*

We turn next to a consideration of the goods, channels of trade and class of purchasers. Although opposer's common law rights are limited to the actual goods and channels of trade for which it uses its mark, we must consider applicant's goods to encompass all the goods as they are recited in the application. *Octocom Systems, Inc., v. Houston Computers Services, Inc.,* 918 F.2d 937, 16 USPQ2d 1783, 1787 (Fed. Cir. 1990).

As noted above, applicant is seeking to register its mark for "irrigation equipment and components, namely, spray nozzles, rotating nozzles and soil moisture sensors for irrigating landscapes, lawns and gardens." Also as noted above, Richard M. Dunn, opposer's Product Manager, Golf & Large Turf Rotors, testified that opposer has made prior use of its mark PRECISION DISTRIBUTION CONTROL on rotating nozzles for irrigating lawns. Dunn Decl., ¶ 26, TTABVue 14. Because applicant and opposer use their marks on rotating nozzles for irrigating lawns, we find that the goods are in part identical. In the context of likelihood of confusion, it is sufficient if likelihood of confusion is found with respect to use of the mark on any item that comes within the description of goods in the application or registration. *Tuxedo Monopoly, Inc. v. General Mills Fun Group*, 648 F.2d 1335, 209 USPQ 986, 988 (CCPA 1981); *Apple Computer v. TVNET.Net, Inc.,* 90 USPQ2d 1393, 1398 (TTAB 2007). Further, through testimony and documentary evidence, opposer has established prior use of its mark PRECISION DISTRIBUTION CONTROL in connection with irrigation sprinklers used in golf courses, parks and

24

other large turf facilities. *See, e.g.*, Smith Decl., ¶¶ 29-31, TTABVue 13, Dunn Decl., ¶¶ 21, 25, TTABVue 14, and TTABVue 16-37. Because the "landscapes, lawns and gardens" identified in applicant's application are not limited in size or to residential or commercial locations, and could include or be included in golf courses, parks and other large turf facilities that use opposer's PRECISION DISTRIBUTION CONTROL sprinklers, we find that the goods are overlapping or otherwise closely related.

There are no limitations as to channels of trade or classes of purchasers in the identification of goods in applicant's application. It therefore is presumed that applicant's goods move in all channels of trade normal for those goods, and that they are available to all classes of purchasers for those goods. *See Canadian Imperial Bank of Commerce v. Wells Fargo Bank,* 811 F.2d 1490, 1 USPQ2d 1813, 1815 (Fed. Cir. 1987); *Toys "R" Us, Inc. v. Lamps R Us,* 219 USPQ 340, 343 (TTAB 1983). Such purchasers would include landscape contractors. Applicant's witness, Mr. Moeller, confirmed this presumption. Moeller Decl., ¶ 53, TTABVue 110. Because the goods are in part identical and applicant's trade channels and classes of consumers must be presumed to encompass all channels of trade and classes of consumers for rotating nozzles for irrigating lawns, applicant's channels of trade and classes of consumers must necessarily overlap with those of opposer. Moreover, opposer has established by a preponderance of the evidence that opposer and applicant are competitors in the marketplace for non-agricultural irrigation sprinklers, and that they sell identical and otherwise closely related goods through

the same channels of trade to the same purchasers. Mr. Dunn testified that 69 of the 89 distributors that sell opposer's PRECISION DISTRIBUTION CONTROL irrigation sprinklers also sell applicant's PRECISION irrigation sprinklers. Dunn Decl., ¶¶ 74, 75, TTABVue 14. Customers, including landscape contractors, can thus purchase both opposer's and applicant's sprinklers from more than one thousand retail locations of distributors throughout the United States. Dunn Dec., ¶¶ 75, 77, TTABVue 14. In view thereof, we find that the parties' goods move in the same channels of trade and are sold to the same classes of consumers.

*Strength of Opposer's Mark/Third Party Uses*

Opposer does not contend that its mark is famous, but argues that potential customers recognize the mark PRECISION DISTRIBUTION CONTROL "as a source indicator of Plaintiff's unique sprinkler" due to more than twenty years of "sufficiently clear, widespread and repetitive" advertising and sales. Opp. Br., p. 41. Opposer points to third parties, such as John Deere Landscapes, that "have acknowledged PRECISION DISTRIBUTION CONTROL as a trademark in their advertisements of Plaintiff's irrigation sprinklers." Opp. Br., p. 41, TTABVue 73-77. Opposer also submitted the testimony declaration of Megan M. Lally, Marketing Director for BISCO, the largest distributor of residential and commercial irrigation products in the New England region. Ms. Lally testified that BISCO carries irrigation products from many manufacturers, including opposer, and that she associates PRECISION DISTRIBUTION CONTROL solely with opposer's irrigation sprinklers. Lally Decl. ¶¶ 8, 9 and 17, TTABVue 148. Ms. Lally's testimony

corroborates the testimony of Messrs. Smith and Dunn regarding the exposure of the mark at trade shows. Smith Decl., ¶¶ 66-68, TTABVue 13, Dunn Decl., ¶¶ 62-63, TTABVue 14. In addition, opposer submitted as exhibits to the Dunn Supplemental Declaration confidential materials showing appreciable marketing expenditures and historical sales figures for its PRECISION DISTRIBUTION CONTROL irrigation sprinklers. Opposer's Exhibits 71-73, TTABVue 105-107.

We consider the arguments and evidence regarding the strength of opposer's mark in conjunction with the sixth *du Pont* factor, which requires consideration of any evidence pertaining to "the number and nature of similar marks in use on similar goods." "The probative value of the third-party trademarks evidence depends entirely upon their usage." *Palm Bay*, 73 USPQ2d at 1673. "As this Court has previously recognized, where the 'record includes no evidence about the extent of [third-party] uses … [t]he probative value of this evidence is thus minimal.'" *Id.* at 1693 (quoting *Han Beauty, Inc. v. Alberto-Culver Co.*, 236 F.3d 1333, 1338 (Fed. Cir. 2001)).

There is no evidence in this record indicating that third parties use PRECISION DISTRIBUTION CONTROL for irrigation sprinklers. Indeed, the record includes evidence of only one third-party (Valmont) that incorporates the term PRECISION as part of its mark for irrigation equipment (PRECISION IRRIGATION MADE EASY) (Opposer's Exhibit 67A, TTABVue 99), however, there is no evidence of actual use of this mark.[19] Moreover, Opposer and Valmont have

---

[19] The other third-party registrations are for PRECISION INDUCTION COOKTOP for "electromagnetic induction cookers for industrial and household purposes" (TTABVue 134),

entered into a consent agreement that allows them to use their marks on their irrigation equipment. (TTABVue 93).[20] Nonetheless, and despite the evidence of consumer recognition of PRECISION DISTRIBUTION CONTROL as a trademark for opposer's irrigation sprinklers, PRECISION DISTRIBUTION CONTROL is somewhat suggestive of a feature of opposer's irrigation sprinklers, namely, that the nozzle mechanism controls the distribution of water in a uniform or even manner, to ensure consistent, even coverage.

While the mark PRECISION DISTRIBUTION CONTROL may be conceptually weak, due to opposer's long use, sales and promotion of the mark, and the consequent degree of consumer exposure, we find that the protection to which PRECISION DISTRIBUTION CONTROL is entitled at least extends to prevent the registration of PRECISION for overlapping and closely related goods.

*Conditions of Purchase*

We next consider the conditions under which and buyers to whom applicant's and opposer's goods are sold, *i.e.,* "impulse" vs. careful, sophisticated purchasers. We recognize that some of the purchasers for applicant's and opposer's goods are landscape contractors, who could be expected to exhibit a degree of care and deliberation in the purchasing decision. However, in this situation, where the parties' marks share the same source-identifying word PRECISION, even sophisticated purchasers are likely to view the marks as indicating a single source

---

and TRUE PRECISION CONTROL for "refrigerated coolers." (TTABVue 139). Neither registration is for irrigation equipment. A registration is not evidence of actual use, and there is no record evidence of actual use of either of these registrations.

[20] We also note that the application file contains a consent agreement between applicant and Valmont.

when they are used on identical and otherwise closely related goods. *See HRL Associates, Inc. v. Weiss Associates, Inc.*, 12 USPQ2d 1819 (TTAB 1989), *aff'd, Weiss Associates, Inc. v. HRL Associates, Inc.*, 902 F.2d 1546, 14 USPQ2d 1840 (Fed. Cir. 1990).

*Actual Confusion*

As mentioned above, the parties stipulated that as of June 2012, neither party was aware of actual confusion arising from the use of their respective marks. ACR Agreement, ¶17, TTABVue 7. The probative value of the absence of actual confusion depends on there being a significant opportunity for actual confusion to have occurred. *Barbara's Bakery Inc. v. Landesman*, 82 USPQ2d 1283, 1287 (TTAB 2007). In this case, even if we were to find that applicant first began to use its PRECISION mark in November 2008, as applicant now claims, the marks would have existed in the marketplace, and thus have been available to common distributors, for a relatively short time – about 3.5 years. We therefore give little weight to the alleged absence of actual confusion. Moreover, actual confusion is not necessary to show a likelihood of confusion. *See Giant Food, Inc. v. Nation's Foodservice, Inc.*, 710 F.2d 1565, 1571, 218 USPQ 390, 396 (Fed. Cir. 1983).

*Conclusion*

We have carefully considered all of the evidence pertaining to the relevant *du Pont* factors, as well as the parties' arguments with respect thereto (including any evidence and arguments not specifically discussed in this opinion). In balancing the relevant factors, we conclude that because applicant's PRECISION mark is highly

similar to opposer's PRECISION DISTRIBUTION CONTROL mark, the goods are identical, in part, and otherwise closely related, and there is an overlap in the channels of trade and the classes of purchasers, there is a likelihood of confusion. Further, opposer has established priority of use. In view thereof, opposer has proven its claim under Section 2(d) of the Trademark Act.

**Decision**: The opposition is sustained.[21]

---

[21] Because we have sustained the opposition, applicant's consented motion to amend its dates of use (TTABVue 132) is moot.